### Pete Banks v. The State.

No. 10529. Delivered May 25, 1927.

Rehearing denied June 22, 1927.

**1.—Murder—Evidence—Held Sufficient.**

In this case, the jury having inflicted the death penalty, the state relied for a conviction upon circumstantial evidence alone. The wife of the deceased, as accomplice, testified that appellant had agreed with her to kill her husband for $150.00. She was, in the judgment of this court, sufficiently corroborated by cogent and convincing circumstances, including certain tracks of a peculiar character, made by rubber boots leading to and from the scene of the homicide, and to a gravel pit, in which a shotgun was found, which was identified as belonging to appellant, the tracks being identical with tracks made by boots that appellant was wearing when arrested. We do not feel warranted in disturbing the verdict, for insufficiency of evidence.

**2.—Same—Continuance—To Prove Alibi—Properly Refused.**

Where appellant asked for a continuance on the ground that he had not had sufficient time to secure his witnesses, by whom he would establish an alibi, and when overruling his motion, was told by the court that he would be given all time necessary to secure the attendance of all witnesses he might ask for on that issue, and all witnesses named by him were present, and testified and he had not asked for a subpoena for any other witness; there was no error in refusing him a continuance.

**3.—Same—Examination of Witness—Repeating Answers of Witness—No Error Shown.**

Where appellant objected to state's attorney repeating the answers of the witness, and the court directed him to discontinue doing so, and no injury appears, the matter presents no error.

**4.—Same—Indictment—Not in Conflict With Constitution.**

Where an indictment uses the word *the* after the words, "In the name and by" in the beginning clause, the addition of the word *the* to the words prescribed in the Constitution does not vitiate the indictment. Our statute prior to the revision of 1925 used the word, but it was omitted in this last revision. It has many times been held that the addition of the word to

those of the Constitution would not adversely affect the validity of the indictment. See Porter v. State, 86 Tex. Crim. Rep. 23, and other cases cited. Also see Vernon's Ann. Const. of Texas, 1925, Vol. 1, p. 372.

### 5.—Same—Indictment—Held Sufficient.

Where an indictment, in the charging part used these words: "*Did then and there unlawfully and with malice aforethought* kill C. P. Jones by shooting him with a gun, etc., same is regarded as conforming to the requirements of the statute. See Art. 398, C. C. P., 1925; Vernon's Tex. C. C. P., 1925, Vol. 1, p. 264, and Branch's Tex. P. C., Sec. 2058, for collation of authorities.

ON REHEARING.

### 6.—Same—Affidavit Attached to Motion—Of No Material Effect—But Cannot Be Considered.

Where appellant attached an affidavit to his motion for rehearing, made by Mrs. Scott, a sister of Mrs. Jones, wife of deceased, intended to show duress over Mrs. Jones by the county attorney and her mental incompetency, we cannot admit that such affidavit is in any sense material or relevant. However, an ex parte affidavit presented originally in this court cannot be considered.

### 7.—Same—Evidence—Held Sufficient.

On rehearing the court has again carefully re-examined the facts in this case. They seem overwhelmingly to corroborate the accomplice, and to point to the appellant as the guilty party. We are confirmed in our original opinion as to the sufficiency of the testimony, and the motion for rehearing will be overruled.

Appeal from the District Court of Fayette County. Tried below before the Hon. M. C. Jeffrey, Judge.

Appeal from a conviction of murder; punishment assessed at death.

The opinion states the case.

*R. V. Solomon, Geo. L. Haidusek* and *John P. Ehlinger,* for appellant.

*Sam D. Stinson,* State's Attorney, and *Robert M. Lyles,* Assistant State's Attorney, for the State.

MORROW, PRESIDING JUDGE.—The offense is murder, punishment fixed at death.

From the testimony of Mrs. C. P. Jones, widow of the deceased, the following synopsis is taken: She and the deceased had been married for about twelve years, though they had been separated part of the time. She had known Banks for about nine years, he having worked for the family, and also for her and her husband. The deceased was a station agent for

a railroad company and lived about a mile from the courthouse. About a month before his death, Jones, over the protest of his wife, had destroyed some flower plants in the yard, and on the following day, the appellant appeared and noticed the destruction of the plants and made inquiry about them. Upon receiving information that they were dug up by the deceased the appellant remarked to the witness: "He treats you dirty. Why don't you freeze him out?" The witness replied: "I would if I could." Appellant then said: "Well, you give me $150.00 and I will do it." To this she assented, and he said: "All right;" that he would do it. Appellant was at the home of the witness about noon of the day on which the homicide took place. She told the appellant that he had failed to do what he had promised to do, and he said: "I will do what I said I would; I will get him." The witness did not see him again until after the deceased was killed. On the evening before his death, Jones went to town, and returned about ten o'clock. He was sitting in his room reading the daily paper. The witness went out of the room to go to bed when she heard an explosion, which she thought was the lamp. Immediately afterwards she heard another, which she identified as the report of a gun. She entered the room in which she had left her husband and found him lying on the floor. She went to one of her neibhgors and had the sheriff and a doctor called. She said she did not know what had happened. Upon the arrival of the sheriff, the deceased was found in his home, dead. There were two wounds from shots fired from a shotgun loaded with "BB" buckshot. Some of the wadding entered one of the wounds. The state introduced evidence that the appellant owned a single-barrel shotgun.

The home of the appellant was some seven miles distant from the scene of the homicide. There was evidence from a number of witnesses and from the appellant that he was in the town near which the deceased lived on the night on which the deceased was killed. The circumstances led to the conclusion that the fatal shots were fired from a position outside of the house, through a screened window, the sash of which was raised. There were tracks of a person wearing boots on the railroad right-of-way and near the home of a woman named Peyton, who was a relative of the appellant, which tracks also led to and from the home of the deceased. The appellant's presence at the Peyton home was established by the testimony of both the appellant and the state's witnesses. He came to her house on horseback and left the horse on her premises until a time near that upon which the fatal shots were fired. The shots were heard by sev-

eral witnesses who agreed with the alleged accomplice that they were fired at about ten o'clock at night. The Peyton woman retired before the appellant returned to her house and got his horse. He testified that he got his horse after the shots were fired. His testimony, however, accounting for his presence and movements after his arrival are not inconsistent with the testimony of the Peyton woman. The tracks mentioned were, according to the officers, plainly visible, and the ground being in a soft condition was such as would retain the impression, and indicated that in approaching the house of the deceased the person making them was walking, and that while leaving it he was running. They led to a point near a gravel pit in which some water had accumulated. There was subsequently found in the gravel pit a twelve-gauge single-barrel shotgun. It had been taken apart and was in three parts, viz.: the stock, the barrel and the pin. This shotgun was discovered by accident, and was definitely identified by several witnesses for the state as belonging to the appellant. His testimony, while not specifically admitting the ownership of the gun was not to the contrary, but he presented the theory that his gun had been lost while laying in his automobile some months previous to the homicide. This fact was controverted by the testimony of witnesses who claimed to have seen the gun in the possession of the appellant a few days before the homicide took place. Appellant testified that he heard the shots fired while walking on the railroad right-of-way. According to his testimony, however, as we understand it, he was not at the places where the tracks were found. The tracks were made by a person wearing rubber boots. There were peculiarities growing out of the make of the boots and the wearing thereof which rendered the tracks distinguishable from those made with another boot. The appellant admitted that he was wearing rubber boots at the time of the homicide, the same that were worn by him at the time of his arrest. Those worn by him corresponded in size and peculiarities with those which made the tracks, and were fitted into the tracks which were found at the place where the assassin stood, as well as in approaching and leaving the house. The appellant was shown to have been at the Jones' home on the day of the homicide and about the time claimed by Mrs. Jones, and also on the other occasions as related by her. He was acquainted with the Jones' surroundings, including the situation of the house, rooms, doors and windows.

Against the judgment the point is made in the brief that the testimony is not sufficient to support the verdict. All of the

testimony in the case, including that of the accomplice witness, Mrs. Jones, is but evidence of facts from which the jury was called upon in the court's charge embracing the law of circumstantial evidence, to determine the identity of the assassin of the deceased.

This court has said that footprints unaccompanied by other supporting facts would not be sufficient to identify one accused of crime. See Warren v. State, 52 Tex. Crim. Rep. 218. Footprints, depending upon their character, are of varying degrees of cogency in bearing upon the identity of the offender. From Burrill on Circumstantial Evidence, p. 82, we take the following:

"Where impressions of human footsteps on earth or snow, having certain peculiarities, are found on comparison to correspond accurately with the shoes of a particular individual, having precisely the same pecularities, the inference or presumption is that such impressions were actually made by the shoes of such person, leading to the further inference of the presence of such person at the place where the footmarks are found."

And from page 267, the following:

"Where certain peculiarities are observed which at once distinguish the impressions from all others, an exact correspondence, verified by the test of comparison, becomes of the highest importance."

In the present instances, the evidence going to show that the footprints at the places where the assassin stood and those leading to and from the place, are of unusual strength, pointing to the identity of the appellant. The conceded and undisputed facts show that the appellant was at the Peyton home, about a mile from the home of the deceased, a short time before the fatal shots were fired; that he left the Peyton home before the shots were fired and that he returned there at a later time and got his horse. He was arrested the morning after the homicide. The boots which he wore coincided in size and in character with those with which the tracks were made. The ground was sufficiently soft and of a character to receive and retain the impressions made. Peculiarities due to the wearing of the boots were observable in the tracks, and the boots worn by the appellant at the time of his arrest were placed in the tracks and fitted with exactness. These conditions; as revealed by the evidence, not only applied to the tracks leading from the Peyton home, but to that of the deceased and those in the yard of the deceased and near the window through which the fatal shots were fired. They apply likewise to the tracks leading to the gravel pit in which was found the gun which belonged to the appellant, which,

according to the state's testimony and contrary to his own, had been seen in his possession but a short time before the homicide. Death of the deceased resulted from the discharges from a gun of the same character as that mentioned. Appellant admittedly was in the neighborhood of the home of the deceased, both before and after the homecide. These matters, taken in connection with the attempted proof of abili, are to be considered in connection with the testimony of the accomplice witness, the substance of which is that the appellant, for hire, had agreed to kill the deceased. It is true that neither the jury nor this court could take account of her testimony in the absence of other evidence corroborating her and tending to connect the appellant with the homicide. If the circumstances warrant the conclusion that he was present when the fatal shots were fired, that he took his gun to pieces and left it in the gravel pit, then it would seem that there were facts independent of the accomplice's testimony, tending to show that her testimony of prearrangement was true and tending to connect the accused with the commission of the homicide. (Art. 718, C. C. P., 1925). There are other facts coming from testimony aside from the accomplice which might be considered, such as the familiarity of the appellant with the premises of the deceased and with his habits, and the presence of the appellant at the home of the deceased upon the occasion upon which, according to the accomplice's testimony, the appellant had promised to kill the deceased, the time and place of the homicide, the condition of the window through which the shots were fired, and the presence of no person save the accomplice, the deceased and the assassin at the time the shots were fired. In testing their sufficiency under the law of circumstantial evidence, the various facts which the jury was authorized to believe from the evidence, are to be taken collectively as forming strands in a rope, each of which has a bearing upon all. See Parrish v. State, 85 Tex. Crim. Rep. 75. Thus considered, this court does not feel justified in overturning the verdict of the jury which has the sanction of the learned judge who presided at the trial.

In bill of exceptions No. 1 there is complaint of the refusal of the court to continue the case. The motion is quite brief and is based upon the averment that sufficient time had not elapsed for the proper preparation of the defense of alibi upon which reliance would be had, the appellant having been confined in jail in the time intervening between the alleged commission of the offense and that of the trial. In qualifying the bill the court stated that at the beginning of the trial counsel was

told that he would be accorded all the time desired by them to ascertain the names and location of witnesses for the defendant; that they thereafter made out a list of witnesses, all of whom were summoned and were present; that the same privilege was again given them at the end of the state's testimony with the assurance by the court that he would have summoned any additional witnesses desired and would hold the case pending until their attendance could be secured; that no others were then called for; and a like announcement was made to them at the end of the testimony. The trial lasted for three days. The statement of facts shows that a number of witnesses testified for the appellant on the issue of alibi.

In bill No. 2, it appears that counsel for the appellant objected to the practice of the district attorney in repeating the answers after the witnesses. The court instructed him to refrain from doing so. The transcription of the stenographer's notes touching this matter was attached to the bill as a qualification, and it appears therefrom that appellant's counsel stated that state's counsel was repeating the answers, and that the court told him not to repeat the answers. We fail to find aught in the bill that would warrant any just ground of complaint.

The indictment reads as follows:

"In the name and by *the* authority of the State of Texas:

"The grand jurors for the County of Fayette, State aforesaid, duly organized as such at the April Term, A. D. 1926, of the District Court for said County, upon their oaths in said Court, present that Pete Banks and Ella Jones on or about the 8th day of May, One Thousand Nine Hundred and Twenty-Six, and anterior to the presentment of this indictment, *in the County of Fayette, and State of Texas, did then and there unlawfully and with malice aforethought* kill C. P. Jones by shooting him with a gun against the peace and dignity of the State."

In his brief appellant's counsel attacks the indictment as insufficient upon two grounds: First, that the beginning is not in the language prescribed by the Constitution. In Art. 5, Sec. 12, of the Constitution of Texas, we find the following quotation:

"All prosecutions shall be carried on in the name and by authority of the State of Texas."

The position taken by the appellant is that by the use of the word "the" in the beginning before the word "authority" the indictment is vitiated. Prior to the revision of the C. C. P., 1925, touching the requisites of an indictment, it was declared that "It shall commence, 'In the name and by *the* authority of the State of Texas'." See Vernon's Tex. Crim. Stats., Vol. 2,

Art. 451, p. 192. The use of this language was prescribed in Willson's Criminal Forms, and has often been sanctioned by this court. In the revision of 1925, the language used "In the name and by authority of the State of Texas." See Art. 396, C. C. P., 1925. It was specifically held in Porter's case, 86 Tex. Crim. Rep. 23, that the use of the word "the," as it is used in the present instance, did not adversely affect the validity of the indictment. See also Weaver v. State, 76 S. W. 564. In the previous case of Moss v. State, 60 Tex. Crim. Rep. 268, there was a like holding with reference to the use of the word "of" after the word "name." Additional precedents to the same effect are collated in Vernon's Ann. Constitution of Texas, 1925, Vol. 1, p. 372. Upon reason and authority we are constrained to conclude that the criticism of the indictment mentioned is not tenable.

It is claimed that the words underscored in the indictment, quoted above, do not constitute a direct averment that the accused "did with malice aforethought," kill the deceased. The statute, Art. 398, C. C. P., 1925, reads thus:

"The certainty required in an indictment is such as will enable the accused to plead the judgment that may be given upon it in bar of any prosecution for the same offense."

The averment in the indictment is regarded as conforming to this requirement of the statute. We refrain from citing precedents. However, we refer to Vernon's Texas C. C. P., 1925, Vol. 1, p. 264, for collation of authorities; also to Branch's Ann. Texas P. C., Sec. 2058.

The judgment is affirmed.

*Affirmed.*

### ON MOTION FOR REHEARING.

LATTIMORE, JUDGE. — Appellant's amended motion for rehearing has attached thereto the affidavit of Mrs. Scott, a sister of Mrs. Jones, widow of deceased, who testified for the state upon the trial of this case. In the affidavit it is stated that after the homicide affiant made several efforts to see Mrs. Jones, who was confined in jail, but was prevented by the sheriff and district attorney's departments. When she finally got to see Mrs. Jones she heard the District Attorney read to her said sister a purported confession in regard to which, after same had been read, Mrs. Jones said that the confession was not true; whereupon the District Attorney said, "I am going to use it to get the clutches on that negro. Woman, don't try to uphold that negro. If you help me now, I will help you later." Fur-

ther, the affidavit states that from childhood Mrs. Jones has suffered from epilepsy, is frail physically, is very credulous and easily overreached and persuaded, and when in a state of excitement and under pressure will admit or deny anything suggested to avoid conflict, commotion or argument; and further, the affidavit states that when Mrs. Scott saw her sister in jail at the time spoken of the latter was extremely agitated, weakened and nervous, so much so that any statement made by her at that time would deserve no credence.

We are somewhat at a loss to know what effect, if any, appellants expects said affidavit to have upon his motion for rehearing. An inspection of the record discloses that Mrs. Jones was not asked in reference to any statement made by her while in jail, to the District Attorney, nor was any statement made by her while in jail offered in evidence. We find nothing in the record tending to show that at the time Mrs. Jones testified in this case she was under pressure or excited or nervous or agitated in any way. No attack was made upon her credibility, nor was there any effort made to show she was in any way, or from any cause, not deserving of credit. We are forced to say that from no angle of the record before us do we find a place where weight can be given to said affidavit, even if such ex parte affidavits could be considered by us, which is not the case.

We have again considered the facts in this case. They seem overwhelmingly to corroborate the accomplice and to point to appellant as the party who fired the fatal shots. Mrs. Jones testified that appellant agreed with her, in substance and effect, that he would do away with deceased for $150; that he promised on the day Mr. Jones was shot, to do it that day. The killing was that night. Appellant was seen in the vicinity that night. He owned a single-barreled shotgun. Deceased was killed by being shot with a shotgun. Appellant's shotgun was found not long after the homicide in a nearby pool of water. An empty shotgun shell was found in the pool. The next morning after the homicide appellant was found wearing rubber boots having peculiarities in the heels and soles. It had been raining prior to the homicide and the ground was soft and damp. Tracks of the boots found on appellant were traced to the window of the room in which deceased was sitting when shot. Two holes were through the screen window. Two reports of the gun were heard by Mrs. Jones and other witnesses. The boots of appellant were fitted in the tracks at the window, and going to and from same, and fitted perfectly. Appellant's admission that he was in the town where deceased lived on the night

of the homicide and that he had on the same boots.found worn by him the next morning, was in evidence. Many other facts and circumstances appear in the record corroborating the testimony of Mrs. Jones. We are only convinced the more after our re-examination of the record of the sufficiency of the testimony, and being unable to agree with the contentions made by appellant, the motion for rehearing will be overruled.

*Overruled.*