ALVIN TURNER v. THE STATE.

No. 17657. Delivered November 13, 1935.

The opinion states the case.

*Rodes & Garrett,* of Emory, and *Jones & Jones,* of Mineola, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

KRUEGER, JUDGE.—The appellant was tried and convicted of the offense of murder, and his punishment was assessed at confinement in the State penitentiary for a term of twelve years.

The record shows that deceased and appellant were neighbors, owning adjoining farms. A controversy arose between them over the boundary line of their respective tracts of land. Appellant claimed Copperas Branch as his north boundary line, while deceased claimed his south line extended across said branch and that appellant had something like eighteen acres of his (deceased's) land under fence. The record shows that appellant and those under whom he claimed had been in quiet, peaceable and uninterrupted possession of the land for a period of about twenty years. The deceased threatened to enter the premises of the appellant and erect a fence along the line which he contended to be the dividing line between his farm and that of appellant. With said object in view he entered upon the appellant's land by pulling the wire from the fence, cutting a right-of-way through the timber, and hauling posts along said right-of-way for the purpose of erecting a fence across said land. On the morning of the day of the alleged homicide, appellant took his gun, went to the branch where he saw what the deceased had done, but failed to see him. From there he went to where his brother-in-law was making hay, whom he assisted until 4:00 P. M., when he left for his home. On his

way home, he picked up his gun, which he had left in some brush along an old fence line, and then went back to where the right-of-way had been cut. He found the deceased on the disputed land making measurements with a stick. He inquired of him what he was doing or going to do, to which the deceased replied that he was going to place a fence across there and regain his land. Appellant remonstrated with him, told him it was his land and to get off, which deceased declined to do, saying that he was going to fence that land and threatened to kill appellant, throwing his hand to his pocket, whereupon appellant shot deceased four times from the effects of which he died.

The record is quite voluminous, containing some seventy-three bills of exception. To discuss all of them would unnecessarily extend this opinion and serve no useful purpose because some of the bills of exception appear to be without merit and other errors assigned will most likely not arise again upon another trial. Hence we shall only discuss such as we think show reversible error.

Bills of Exception Nos. 29, 30, 31, 32, and 33 reflect the following occurrence: After M. L. Allen had testified that he had known appellant something like fifteen or twenty years, that he knew his general reputation in the community in which he lived as a peaceable and law-abiding citizen to be good, the District Attorney, on cross-examination, propounded the following interrogatories to him:

"Q. You heard about him killing Charlie Harrell and heard it discussed by people in that community, haven't you? A. Yes, sir.

"Q. You have heard how he was killed, haven't you? A. Yes, sir.

"Q. You have heard he was shot in the back, haven't you? A. Yes, sir.

"Q. Do you undertake to tell this jury you now know Alvin Turner's general reputation for being a peaceable and law-abiding citizen in the Rocky Point community and that it is good now? A. No, sir, I don't say that now."

Again to the witness George Alexander, the District Attorney propounded the following interrogatory: "What I am asking is if you have been intimately associated with the people of that community since this killing and you will tell this jury that his general reputation out there now as being a peaceable and law abiding citizen is good? The witness replied: "No, I am not in position to tell this jury on my oath I know his general reputation in that community for

being a peaceable and law-abiding citizen, and nobody else could."

Similar questions were propounded to all of the witnesses who testified to appellant's general reputation as a peaceable and law-abiding citizen. It is apparent from the bills of exception that the inquiry by the District Attorney of the appellant's reputation since the commission of the alleged offense up to the time of the trial was based upon the offense charged in the indictment. It does not appear from the record that since the commission of the alleged offense there had been any discussion by the people in his community of any matter other than the act for which appellant was being tried as affecting his reputation. Hence, it is obvious that the State threw the weight of public opinion, based on the alleged offense charged in the indictment, into the balance against him on his good reputation. It is true that appellant, by filing a plea for a suspension of sentence in the event of a conviction, put his reputation in issue up to the time of trial independent of the offense for which he was on trial. The issue of the suspension of sentence was incidental to the main trial and did not become a proper subject for a discussion and determination of the jury until they had determined his guilt. In the case of Stephens v. State, 80 S. W. (2d) 980, in which appellant had filed a plea for a suspended sentence, a similar question was presented to this court, in which case it was said: "If subsequent to the return of an indictment against a defendant there arose a discussion of his reputation based on matters other than the present indictment, proof of such general reputation might not be inhibited, but this should be made clear in the court's charge." We believe that the rule announced by the court in that case to be the correct rule and therefore sustains the appellant's contention.

Appellant, in due time, objected to paragraph 19 of the court's charge wherein the jury was instructed as follows: "If you believe from the evidence that Charles J. Harrell, the deceased, at the time of receiving the fatal shot which resulted in his death, was a trespasser upon land in possession of the defendant, and upon being ordered by said defendant to leave said premises, if he was so ordered, refused to do so, then the said defendant would be justified in using all reasonable and necessary force to expel the said Charles J. Harrell from said land. But the defendant would not be justified in taking the life of the said Charles J. Harrell without first exhausting all other means to expel the said Charles J. Harrell from said

384

land before resorting to the act of killing him, and if you find the defendant killed the deceased after first exhausting all other means to expel him from said land or if you have a reasonable doubt thereof you will acquit the defendant."

While the charge complained of is in the language of the statue, it occurs to us that it is too comprehensive in its scope and meaning. The intention of the statute, as we construe the same, means that the defendant would not be justified in taking the life of deceased without first exhausting all other available means at his command at the time in his effort to retain possession of his property and to eject the trespasser. The law would not require him to leave the premises to institute legal proceedings to prevent the aggression. The law gives possessor of real estate the right to retain possession against all trespassers, requiring claimants not in possession to resort to legal proceedings to settle the controversy. Deceased was not only a naked trespasser but had already destroyed some of appellant's property and was then preparing to take a part of the appellant's land. It is our opinion that the court should have responded to appellant's objection to the charge, and in connection with the instruction complained of, given the appellant's special requested charge No. 2 or one of like import. We believe that the opinion herein expressed is fully supported by the ruling of this court in the case of Sims v. State, 38 Texas Crim. Rep., 637, 44 S. W., 522, wherein a similar question as the one here presented was discussed quite at length. We are constrained to sustain the appellant's contention.

For the errors hereinabove pointed out, the judgment of the trial court is reversed and the cause remanded.

*Reversed and remanded.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.