## I. W. WATSON V. THE STATE.

No. 22512.   Delivered May 19, 1943.
Rehearing Denied (Without Written Opinion) June 23, 1943.

The opinion states the case.

*W. E. Martin*, of Abilene, and *Pete E. Turner*, of Midland, for appellant.

*Spurgeon E. Bell*, State's Attorney, of Austin, for the State.

BEAUCHAMP, Judge.

Appellant was assessed a penalty of ten years in the penitentiary by a jury in Ector County, there being a change of venue from Midland County where an indictment was returned charging him with assault to murder with malice.

The accused was the operator of a hotel, dance hall and cafe in the negro section of the city of Midland. On Saturday night, May 16, 1942, his place of business was in operation to a late hour and long past midnight. Some of the other business houses in that section were kept open equally late. The officers had made frequent trips into the section during the night, keeping down disturbances and making arrests at more than one place and time, apparently for drunkenness and "rowdyism." Their last call into the section was to appellant's place of business, where they found several drunks, among them a negro woman, who was boisterous and resentful of the officers' demands that they quiet down. At this time a man and woman were arrested and carried

in a car to jail. It is clear from the evidence that appellant resented the intrusion of the officers and particularly the arrest of the woman. From his involvement he emerged with a wound on the head which bled profusely, all of which made him very angry, according to the testimony of practically all of the witnesses, some of whom said it was an officer who hit him. After the officers had left the place with the arrested parties, they received a call to quiet a disturbance at another cafe a short distance away. They answered this call but found no disturbance. Several negroes were near the place and among them was the appellant. The officers returned to the station and soon received another call telling them of a disturbance at Watson's place. Four officers, among them being Glenn Hudson, the injured party, and L. H. Tyson, Chief of Police, responded to this call, going to the section in an automobile. As they crossed the railroad track and turned left toward the place of business of the appellant, they observed the lights were out in it, and about this time a shot was fired into their car from their left and in the direction of the railroad which was in front of and across the street from the Watson establishment. A second shot, and probably others, were fired, wounding Hudson and another. A shotgun and rifle were used as revealed by the car damage.

The question presented seeking a reversal of this case, which requires considerable consideration, is on the sufficiency of the evidence. The State relied much on the evidence of a negro boy, Clyde Allen, who was an accomplice to the offense, and whose testimony is amply sufficient to support the conviction if it is supported by that degree of corroboration required by law. He was a roomer at the Watson hotel and was in his room when the officers made their visit to the place. He went to the hotel and pool hall about the time the officers left and heard Watson telling about his mistreatment and threatening the officers. Watson had a gun in his hand and was making threats to shoot the officers who had gone to their car, but he was prevented from doing so by the witness. After the officers left, Watson said he "was going to get the police down there and have it out with them." He asked a number of other negroes if they had pistols and told those who did not have them to get them. He suggested that some one call the officers and tell them that there was a disturbance down there and cause them to come back. He gave some one a nickel to make a telephone call. They then walked to King's Cafe, to which the police had been directed, and were near it when the policemen came, but were not ready for the battle. He took the witness to James Moore's place, a short distance away, and asked Moore if he had a gun for the witness to

use. The witness detailed the position they took relative to the railroad and to the car when the shooting began. Watson whistled when the officers arrived and notified the other participants in the ambush. Then a shot was fired by some one, at which time the witness ran away from the scene. He pictured Watson as the leader of the uprising.

We have concluded that the evidence of the other witnesses, together with the collective force of all the surrounding circumstances, sufficiently corroborate the story told by Allen and support the verdict of the jury.

Richard Brown, janitor for the First National Bank and who had a place of business in the vicinity, heard the shots fired while he was at James Moore's place. This was a few minutes after Watson, accompanied by Allen, had come to Moore's place and asked for a gun. Brown did not understand all that was said, but heard Moore reply, "No." Watson then said, "Get your hat tight, I'll fix it so a black son-of-a-bitch can't stay here." This was some ten or twelve minutes before the shooting. James Moore followed this testimony for the defendant and accounted for Brown's presence at his place when Watson and Allen came to it. He said that Watson came to his room, accompanied by Allen, and asked if he (Moore) had a gun that Watson could get, to which the witness replied in the negative. He did not hear the statement which Brown testified that Watson then made. He described Watson as having a gash in his head and blood was running down on his shirt. He further said of Watson: "He might have been pretty excited." After the shooting of the officers Watson came out of his hotel, where his wife said he occupied a room, secured the services of a taxicab and went to a house in the opposite side of the city, where he apparently spent the rest of the night. He did not testify in the case, and the evidence on the question of alibi is hardly sufficient to raise the issue and none was submitted.

It is amply shown by other evidence than that of Allen that appellant was much disturbed over his difficulty with the officers and their conduct in arresting parties in his place of business. This showed a motive and supported the threats to which Allen testified. The witness described the scheme to get the officers back by having calls for them over the telephone. Such calls were made, two of them, as stated. He said that he and appellant were at the cafe to which the officers were first directed and the officers saw them. This was a short while after he had been seen at his own place of business which he personally conducted. The witness testified to the disturbance and

direction from the car which the parties were placed with their guns. The range of the bullets fired into the car corroborated this statement. The testimony of Brown and Moore corroborated the witness' story of the appellant's conduct in trying to borrow a gun. At this time appellant was making threats, as stated by Allen.

In answer to an argument in favor of the weight of the corroborrating circumstances, it has been stated that the officers had raided practically every place in the vicinity and also in a nearby district occupied by Mexicans, thereby presenting that there was just as much of a circumstance involving others as this appellant. We do not so view the evidence. Other arrests were made but apparently without a disturbance. Where, for what reason, and under what circumstances, the appellant did not' choose to show. No other person is shown to have made threats. No other person is shown to have been so disturbed as appellant. No one else was around trying to borrow guns to arm other persons. No suspicion is cast upon any others by any of the circumstances of the case. Appellant alone is placed in this position, but whatever might have occurred and whoever else might have been involved, it is definitely shown that appellant was engaged in the perpetration of the crime. Had it been shown that the entire negro population was involved, the evidence also shows that appellant was one of the chief actors. No evidence is placed in the record with any force to extenuate the circumstances involving him.

As has been frequently expressed, it is difficult to lay down a general rule of construction applicable to all cases by which to measure the sufficiency of the evidence to corroborate an accomplice. Uniformly, do we find that each case has its characteristics. Appropriate to the facts of this case are the conclusions of Presiding Judge Morrow in Banks v. State, 296 S. W. 563, from which we quote:

"There are other facts coming from testimony aside from the accomplice which might be considered, such as the familiarity of the appellant with the premises of the deceased and with his habits, and the presence of the appellant at the home of the deceased upon the occasion upon which, according to the accomplice's testimony, the appellant had promised to kill the deceased, the time and place of the homicide, the condition of the window through which the shots were fired, and the presence of no person save the accomplice, the deceased, and the assassin at the time the shots were fired.

"In testing their sufficiency under the law of circumstantial evidence, the various facts which the jury was authorized to believe from the evidence are to be taken collectively as forming strands in a rope each of which has a bearing upon all. See Parish v. State, 85 Tex. Cr. R. 75, 209 S. W. 678."

Judge Christian has said in Cubit v. State, 54 S. W. (2d) 535, as follows: "The law forbidding a conviction upon the uncorroborated testimony of an accomplice does not demand that there be direct evidence pointing to the accused as the offender, but merely requires that there be other evidence tending to connect the accused with the offense committed."

And, from Minor v. State, 108 Tex. Cr. R. 1, 299 S. W. 422, he quotes with approval as follows: "Circumstances proved by credible witnesses may be as potent as direct testimony in tending to connect the accused with the commission of the offense. * * * * * It is the combined and cumulative weight of the evidence furnished by non-accomplice witnesses which supply the test."

If there is evidence by nonaccomplice witnesses to facts tending to connect the accused with the commission of the offense, the requirements of the law seem to be satisfied. When all the surrounding circumstances of this case are considered, we are firm in our conclusion that the evidence is sufficient and ample to satisfy the requirements of the law in corroborating the evidence of the witness Allen.

Other questions in the case relate to the failure of the court to grant the motion for a continuance for absent witnesses. The bills on the subject are very lengthy and several questions have been raised relative to the sufficiency of the application, but we deem a discussion precluded because of the obvious lack of diligence in securing the attendance of the witnesses in Ector County. When the case had been tried in Midland County and a new trial granted, it was transferred to Ector County. The witnesses were not recognized and instructed by the court as to their duty. It is not shown that any process was served upon them requiring their attendance in Ector County. As to one about which the contest seems to center, it is not shown that the defense had any reasonable hope of securing attendance at any subsequent term of court, but it appears likely that they could not.

Finding no error in the trial of the case, the judgment of the court is affirmed.